## OF THE

# Supreme Court of Florida,

## AT

# MARCH TERM, 1854,

## HELD AT MARIANNA.

THOMAS M. WHITE, APPELLANT, VS. GEORGE, WALKER, AP-
PELLEE.

1. A decretal order made by consent, cannot be set aside, either ' upon appeal or re-hearing ; but an order thus made may be set aside by *consent.*

2. A Master must not go beyond the matters referred to him ; if he does, his report, so far as relates to that matter, is a nullity.

B. A reference to the Master will not authorize a report by him more extensive than the allegations and proof.

4. A report which is erroneous on its face, may be enquired into without any exceptions.

5. It is a general and material rule in all cases of accounts, that where there has been a settlement, and the account has either been signed, or a security executed at the foot of it, a Court of Equity will not open that transaction, unless the evidence produced (founded on the charges in the bill,) shows the transaction to be iniquitous ; that it ought not to be brought forward at all to affect the party sought to be bound.

6. Mere inadequacy of price, if the bargain is fair, is-no ground for relief.

7. If the value of a thing sold depends upon a *contingency*, although *great advantage* may be gained, yet the contract shall be sustained.

8. Concealment of a material fact by the party whose duty it is to disclose it, is sufficient to set aside a contract.

9. A partner purchasing must give a full account of the state of the property.

10. To these general rules there are qualifications, suited to cases of an extraordinary nature.

11. As if the party making the representation was speaking not from personal knowledge, but with reference to accounts that were equally open to both parties, and the representations were justified by such accounts.

12. A party cannot be charged against his own denial, in his answer under oath, on the testimony of only a single witness; it must, to warrant a decree, be contradicted by at least two witnesses, or by written documents.

13. But the answer, to have this power, must be direct and positive.

14. Fraud is not to be presumed, but must be proved.

15. The report of a Master containing upon its face material errors, should not be made by the Court the basis of a decree.

16. Testimony merely *conjectural* is wholly inconclusive, and ought not to be received.

17. As a general rule, the prevailing party is entitled to costs, as well in equity as at law; yet costs do not always follow the decree in favor of a party. They are in the sound discretion of the Court, and are to be awarded or refused according to the justice of each particular case.

Appeal from a decree of the Circuit Court of Jackson County, sitting in Chancery.

The opinion of the Court contains a full statement of the facts in the cause.

*W. G. M. Davis* for Appellant.

*R. L. Campbell* for Appellee.

DOUGLAS, J., delivered the opinion of the Court.

The bill filed on the 23d October, 1843, in the Superior Court of Jackson County, by the appellee, charges that on the 7th September, 1838, the parties entered into a copartnership, under the style of White & Walker, for the purpose of merchandizing, at Marianna, Fla.; that by the articles, which were in writing, it was agreed that the busi-

ness should be under the care and management of the appellant, for which he was to receive a reasonable compensation; that each party should contribute the sum of $2,757.25, as his share of the capital stock, and each enjoy an equal share of the profits, after the payment of all the debts; that the capital was paid in by the parties, and large stocks of goods were purchased, partly for cash, and partly on credit, from the Fall of 1838 till April, 1843, when the stock on hand was sold to F. R. Ely; that respondent always had the exclusive management and control of the business, and complainant had nothing to do with it, whatever; that the business was eminently prosperous, the goods having been sold at large profits, and but few bad debts contracted; that respondent purchased property, and in other ways speculated with the funds of the concern, for his own benefit, and abstracted assets of the firm to a large amount, with which he failed to charge himself; that respondent did not, as he was bound and paid to do, under the articles of copartnership, devote his exclusive attention to the business of the firm, but on the contrary, gave a large portion of his time to other occupations, by which the concern was greatly injured; that the books were falsely and fraudulently kept, and presented but a partial and confused history of the business; that in the early part of June, 1843, when complainant was in a feeble state of health, respondent proposed a dissolution of copartnership, and a division of its assets, and succeeded, by presenting false and simulated accounts of the business, in procuring for the sum of $9009.23, ($1000 in cash, and the balance in complainant's account, and notes of third persons,) a receipt in full for complainant's interest in the firm, and that a much larger sum than that represented by respondent, upon said settlement, would appear to be due him upon a just and fair account, and the bill prays an account that the settle-

ment may be set aside, his receipt cancelled, the partnership dissolved, &c.

On the 6th March, 1844, a general demurrer to the bill was filed, which being overruled, on 30th March, 1844, by consent of parties, an order was made, giving respondent thirty days to file his answer, and appointing commissioners to take and state an account.

On 20th August, 1844, respondent filed his answer, admitting the copartnership, and the articles as set forth in the bill; that the capital stock of $2,757.25 each was paid in by the parties; that large stocks of goods were purchased between the Fall of 1838 and April, 1843, when the stock on hand was sold to F. R. Ely; that the business was conducted exclusively by respondent; that he did use the funds of the firm, to a limited amount, in the purchase of property, but accounted for the same, and charged himself with everything he procured from the concern. The answer *denies all fraud*, and states that in May, 1843, respondent was informed by complainant that he wished to sell his interest in the concern, with the view of leaving the country, and requested respondent to make him an offer; that respondent replied he could not say what would be an equitable price for his interest, but he would " make out a *full* and *complete* statement of the assets and liabilities of the house, exhibit them to him, and if then complainant desired it, he (respondent) would make him an offer to take or give a stated sum ;" that complainant said that he was willing to *take less than half*, as he desired to quit the *country ;* that on 7th June, 1843, respondent submitted to complainant statements A. and B., (which are appended to the answer,) requesting him to examine them, and offering him access to the books to aid him in his examination ; respondent told complainant that he would rather sell than buy, and would take $8,500 for his interest ; that respon-

dent having fully explained exhibits A. and B., told complainant that inasmuch as he, respondent, was more intimately acquainted with the business affairs of said firm, and its customers, and could make more out of the bad debts than complainant could, he, respondent, would give complainant the sum of $9,000 for his interest, in the following payments, to-wit: $1,000 in cash, $1,769.11 in his, complainant's, account, and the remainder to be selected by complainant from all the business papers, notes, and accounts, &c., of the firm, which proposition complainant accepted, and the bargain was consummated; complainant gave respondent a receipt in full, and respondent entered into an obligation to pay all the debts of the concern; that according to exhibits A. and B. all the good debts and assets of the firm amounted to $19,652.53, besides complainant's account for $1,769.11, respondent's account for $1,329.35, and that the debts due by the house amounted to $2,765.66, and the bad debts to $4,080, and the answer sets up this as a full defence to the bill.

*Abstracts of Exhibits A. and B.*

| | | |
|---|---:|---:|
| Assets deemed good, | $19,652 | 53 |
| Amount of complainant's account, | 1,769 | 11 |
| Amount of respondent's account, | 1,329 | 35 |
| | $22,750 | 99 |
| Deduct amount of debts owing, | 2,765 | 66 |
| To be divided between the parties, | 2)19,985 | 33 |
| Each entitled to | $9,992 | 66½ |
| Amount received by complainant, | 9,009 | 00 |
| | $983 | 66½ |

Upon the coming in of the answer, the commissioners appointed having failed to report, the order appointing

them was, by consent of parties, vacated and annulled, and William Nickels was appointed Master, to *examine the books and papers of said concern, and report upon them, in reference to the charges made in complainant's bill.*

On the 4th day of May, 1846, Master Nickels filed his report, with accompanying schedule, stating the profits of the concern, after paying all debts and losses, at $30,872, 69. From this sum, however, the capital stock, $5,514.50. and the bad debts, amounting to $4,080, (in order to show the nett profits, according to his calculation,) to be deducted. Deduct these two items, which together amount to $9,594 50, and there remains $21,278.19.

On the 25th day of May, 1846, the appellant filed his exceptions to the report, and the same having been argued, the case was again referred to George F. Baltzell, as Master in Chancery, upon six points, viz:

1st. To ascertain the value of the bills of the Union Bank, during the existence of the firm;

2d. To take further testimony as to the sale of Union Bank money to Benjamin Wynns;

3d. To take further testimony as to the amount of goods sold for notes of third persons;

4th. To review the exchange and interest account;

5th. To take further testimony as to the sale of Union Bank money to Thomas M. Bush;

6th. To ascertain the solvency or insolvency of the persons named in exhibit A. as being insolvent.

And on the 26th of January, 1848, Master Baltzell filed his report, which, however, was attended with no definite result, except ascertaining the value of Union Bank money, increasing the interest and exchange account in favor of the concern, and proving all the persons named in exhibit A. to be insolvent at the date of the settlement.

On the 10th of May, 1848, exceptions were filed to the
13

second report. The cause having been argued on the exceptions to the several reports, on the 13th day of January, 1852, an interlocutory decree was rendered, decreeing a balance of $3,720.37 to have been due complainant on the 8th of June, 1843, after allowing respondent credit for $9009.33, paid complainant at the date of the settlement, and a credit of $4,080, for the bad debts set forth in exhibit A., that the said settlement be vacated, the partnership dissolved, and the case set for a final hearing on the question of interest and costs.

On the 22d day of November, 1852, a final decree was rendered, in favor of the appellee, for the sum of $6,534.22, and costs, and thereupon the appellant appealed, has brought his case up to this Court, and the question now to be determined is whether that decree is right or not. The cause has been argued with great zeal and ability upon both sides.

On the one hand, it is contended that the decree of the Circuit Court is wrong; that it ought to be reversed, the settlement sustained, the bill dismissed, and the costs taxed upon the fund : on the other, that the said decree is right and proper in all things, except that it ought to be increased by the amount of $2,757.25, the portion of the capital stock furnished to the concern by the complainant.

The first and most important question presented for our consideration, is whether the sale made by the complainant of his interest in the concern, to the respondent, on the 8th day of June, 1843, should or should not be sustained, and we are met at the very threshhold of this enquiry by the position that "the order of the 30th of May, 1844, for an account, established the fact that the appellant was an accounting party, and in establishing that fact, nullified the settlement."

It may be well here to remark that the transaction be-

tween the parties, of the 8th of June, 1843, purported to be a sale by the complainant of his interest in the concern and a purchase of it by the respondent, and not a settlement of the matters of the partnership, any further than such a sale and purchase would have that effect. The respondent states in his answer that the complainant said that he was willing to take less than one half of the profits of the concern, and it appears, both by the answer of the respondent and the testimony of J. W. Russ, that he hurried the respondent into the arrangement, and did not give respondent time to make out a full statement of all the matters of the concern, so as to show what the amount of the nett profits were.

Now in regard to the order of the 30th of May, 1844, it is very evident that the Court did not understand that it nullified this sale and purchase, or it would not (as it did,) in the same order have given to the respondent thirty days within which to file his answer. If this order established the fact that the respondent was an accounting party, all that remained to be done, was to ascertain the amount of his liability, and that was not the object of the appointment of Master Nickels. He was appointed for the express purpose of examining the books and papers of the concern, in order to ascertain whether the respondent was an accounting party or not. The respondent did not so understand the effect of the order, or he would not have set up his purchase of the interest of the complainant in his answer, as a bar to the suit; and it surely could not have been so understood by the complainant, or his learned and able counsel would undoubtedly, on the coming in of the answer, have excepted to it for that reason, and had that matter stricken out, as irrelevant and improper. It is, however, deemed a sufficient answer to the objection to say that this order, made by consent, was, after the answer was

filed, also by consent of parties, revoked, vacated and annulled, and that no other order for an account appears in the record.   It is further insisted that a decretal order, made by consent, cannot be set aside, either upon a rehearing or appeal, and to this we assent; but we think such an order, made by consent, may by consent be set aside.   The next order, the one appointing William Nickels Master, and referring the matter to him, shows that he was appointed to examine the books and papers of said concern, and report upon the same, with reference to the charges made in complainant's bill.   He was not required to state an account —it was no part of the duty assigned him ; and the same may be said of George. F. Baltzell, who was subsequently appointed, who seemed to understand his duty, and did not attempt to state an account.   So far, therefore, as regards the account stated by the Master Nickels, it was a nullity. The Master, (says Mr. Daniel, in his able work upon Chancery pleading and practice, vol. 2, page 1478,) must not go beyond the matters referred to him, and it is, he says, laid down in one of Lord Bacon's orders, Beams orders, 23, that if a Master reports as to matter which is not referred to him, his report so far as relates to that matter is a nullity. It has been decided that in such a case the proper course is not to except to the Master's report, but before it is confirmed to apply to the Court that it may be referred back to the master, to review his report, but that if no such application is made, and the report should be confirmed, the Court will pay no attention to it, except so far as it is warranted by the decree.   Jenkins vs. Briant, 6 Sim., 605. A reference to the Master will not authorize a report by him more extensive than the allegations and proof warrant, and a report which is erroneous on its face, may be enquired into without any exceptions.   Levert vs. Redwood, 9 Porter, 80.   If the Master has exceeded his authority, the

Court will either direct him to review his report, or take no notice of his finding. 2 Daniels' Ch. Pl. and Pr., 1501.

Having disposed of the foregoing propositions, we come now to the important question whether the sale by the complainant of his interest in the concern to the respondent ought to be set aside or sustained. It is a general and most material rule in all cases of accounts that where there has been a settlement, and the account has either been signed or a security executed at the foot of it, a Court of Equity will not open that transaction, unless the evidence produced (founded on the charges in the bill,) shows the transaction to be so iniquitous that it ought not to be brought forward at all to affect the party sought to be bound. 1 Hovenden on Frauds, 160 ; Chambers vs. Goldwin, 9 Ves., 266 ; Drew vs. Power, 1 Sch. & Lefr., 192 ; Farnham vs. Brooks, 9 Pick. Rep., 231. Some principles, however, (say the Court in the last case cited,) may be extracted from the decisions which stand not contradicted by others, and therefore may be adopted as rules. One is that mere inadequacy in price, if the bargain is fair, is no ground for relief. Another that if the value of the thing sold depends upon a contingency, although great advantage may be gained, yet the contract shall be sustained. Another that old age or infirmity alone, without practice upon it, shall not avoid a contract. Perhaps (say the Court,) the whole doctrine may be summed up in this brief sentence taken from a case in Sch. & Lefr., 209 : Concealment of a material fact, by the party whose duty it is to disclose it, is sufficient to set aside a contract. And in another book, (1 Simons' Ch. Rep., 89,) it is said that a partner purchasing must *give a full account* of the state of the property ; and in 3 Swanst., 73, it is said *full information is required ;* and in 14 Ves., 300, *that although the purchaser may not be aware of the duties of giving information, &c., which the Court would require in the situ-*

*ation in which he stood, it is necessary to impute knowledge which the party may not actually have had.* We subscribe to these doctrines generally, but are satisfied that there must be qualifications suited to cases of an extraordinary nature, in which a strict application of the rule would infallibly produce injustice. If a trustee, or an agent, undertakes to purchase of the owner an estate, or stock, or debts, with the condition of which he may be well acquainted, and of which the owner may be entirely or partially ignorant, there is no doubt a sufficient disclosure should be made to enable the owner to judge of the adequacy of the offer made; and if there is anything misrepresented, or concealed, or withheld, even without a design to conceal, the bargain will be void. But suppose the subject matter of the bargain to be of a complicated nature, such as an account running through many years and many volumes of books, and relating to transactions which may in a measure have gone out of memory; in such cases, all that fairness requires would seem to be to give information sufficient to lead the party into an enquiry, a willingness to answer to all questions put, and a surrender of all the materials of knowledge by the purchaser to the seller.

The exhibit of a balance considerably larger than the sum offered for it, is of itself one pretty strong ground of enquiry, and an intimation of contingencies which may affect the bargain, and if the books and memoranda containing the elements from which the balance is composed, be offered for scrutiny, there seems to be no ground to impute fraud. If the party entering into the contract has the full means of knowledge committed to him by the other party, and does not choose or neglects to avail himself of them, it is his own fault if the bargain turns out to be unfavorable. He may have too much confidence in the party with whom he deals to think it necessary to go into a particular

examination, but if that confidence is not well placed, the bargain will not be affected. Farnham vs. Brooks, 9 Pick. Rep., 233, 234.

An agreement will not be avoided by reason that representations made by one party to the other, upon the subject of the agreement, are not correct, if it be manifest that the party making the representations is speaking not from personal knowledge, but with reference to accounts which were equally open to both parties, and if the representations be justified by those accounts. Harris vs. Kemble, 2 Eng. Cond. Ch. Rep., 57.

We have been referred by complainant's counsel to the case of Maddeford vs. Austwick and Austwick vs. Maddeford, 1 Simons' Rep., 89, 2 Eng. Cond. Ch. Rep., 45, to show that where a partner who superintended exclusively the accounts of the concern, agreed to purchase his copartner's share of the business, for a sum which he knew, from accounts in his possession, but which he *concealed* from his copartner, was an inadequate consideration, the agreement was set aside. But there are several circumstances which materially distinguished that case from the case at bar. One is that at the time the agreement was made between the plaintiff and defendant, the defendant had in his possession a *private book*, which contained a statement of the accounts between the plaintiff and defendant, made out by the defendant, whereby it appeared that the one thousand pounds which the defendant agreed to pay to the plaintiff, in addition to the money which he had drawn from the concern, would have been nearly but not quite a fair consideration, if no profits had been made from the concern of the mint; but taking the mint profits into the account, which the defendant was unquestionably bound to divide with the plaintiff, it would have been many hundred pounds less than the plaintiff would be entitled to

receive. This *private book he concealed.* The public books of account belonging to that concern, to which all parties had access, were (as were those of White & Walker,) of an intricate nature. The respondent in this case had no such private book; and moreover, in that case the proposition to purchase was made by the defendant, and there is nothing to show that the plaintiff did not seek a full share of the profits, while in this the proposal to sell came from the complainant, who evinced a desire for an *immediate* close of the business, without waiting until the full statement of the matters of the concern could be ascertained, expressing a willingness to take *less than one half the profits*, respondent at the same time offering him full access to all the books and papers of the concern, and suggesting the propriety of a full examination. And here it may not be improper to observe that this case was argued throughout, on behalf of the complainant, as though the respondent, at this juncture of their affairs, had undertaken to make out and present to the complainant (before he would make him an offer of what he would give for his share,) a full statement of all the matters of the concern, whereas his undertaking (and this not at the instance of the complainant,) was to make out a statement of the assets and liabilities. This he did—whether substantially correct or not will be seen hereafter. In this case, the accounts were of a complicated nature, running through four and a half years, and through many volumes of books, and relating to transactions many of which had in a measure gone out of the memory of the respondent, as appears by his examination before the Master. He gave information sufficient to have put the complainant on enquiry, advised it, and offered the books and memoranda containing the elements from which the balance is composed, for the scrutiny of the complainant. There is no pretence that he at any time evinced any un-

willingness to answer any questions put to him by the complainant. Where, then, is the ground to impute to him fraud, either actual or constructive? The defendant, by his answer, denies all fraud, and, indeed, all the charges alleged, and all the facts set forth in the bill as grounds for the interference of the Court. The answer is sworn to, and it is a well settled rule in Equity that a party is not to be charged upon any fact stated in the bill, against his own denial, in his answer under oath, of the existence of such fact, if the proof of the fact is only by one witness, upon the equitable principle that if he is put upon his oath by his adversary, credit shall be given to his own declarations, unless they are contradicted by at least two witnesses, or by written documents, or pregnant circumstances. In every case the answer of the defendant to a bill filed against him, upon any matter stated in the bill, and responsive to it, is evidence in his own favor, and is conclusive, unless overcome by the testimony of two opposing witnesses, or of one witness, corroborated by other circumstances and facts, which give-to it a greater weight than the answer, or which is equivalent in weight to a second witness. 2 Story Eq. Jur., Sec. 1528, and note 2, page 995, 5th Ed. But then the answer, to have this power, must be direct and positive. Only vs. Walker, 2 Atkyns, 407; Walton vs. Hobbs, ibid., 19; Arnut vs. Biscue, 1 Ves., Sr., 97; Lenere vs. Lenere, 1 Ves., Sr., 66; Wetmore vs. White, 2 Caine's Cases in Error; Farnham vs. Brooks, 9 Pick. Rep., 249, 250. The answer in this case is direct and positive. The question of fraud is one of motive and intent, and can rarely if ever be considered as a single fact, but a conclusion to be inferred from all the circumstances of the case. In conclusion, however, the same general rule prevails in equity as at law; it is not to be presumed, but must be proved. Wilson & Cleland vs. Luke Lott, 5 Fla. R., 316.

492                    SUPREME COURT,

Where, we would ask, is the evidence to fix the charge
of fraud or liability upon the respondent ?   We have care-
fully examined the testimony of every witness who was
sworn to testify in the case, and have found nothing in it
which establishes any such charge.   We may, therefore,
safely say it does not exist, unless it is to be found in the
report of the Master Nickels.   Hence we turn to that re-
port, and what do we find ?   A document full of errors and
exceedingly unsatisfactory, although it cost him about eight
months' labor to prepare it,  a recast of the books, *in his
opinion*, being necessary to enable him to make out a
statement of the affairs of the concern ; and when it comes,
what does it present ?   This recast of all the books, with
schedules, &c., and a long report, mostly upon matters not
referred to him, without a single word as to the char-
ges in the bill, (except in the caption referring to his ap-
pointment,) in regard to which and for no other purpose
he was appointed to examine the books and papers of the
concern.   There is presented, amongst other things, a pa-
per marked T., called a profit and loss account, showing a
balance of $30,872.67, which he reports as the nett profits
of the firm, and yet in this important account he forgot (or
did not know that it was necessary, in order to show the
nett profits,) to deduct the amount of the capital stock paid
in and the amount of bad debts, together amounting to near
one third of that sum.

Now if he committed so gross an error in an account cov-
ering less than half a sheet of foolscap paper, what errors
may he not have committed in recasting the whole set of
books of the firm of White & Walker, which did a large
business, running through a period of four and a half years ?
And ought such a report to be taken as conclusive,
and as sufficient evidence to establish the grave char-
ges made against the respondent in the complainant's

bill, especially after all of the books and papers of the concern have been burned up, so that they cannot be referred to for the purpose of testing the correctness of the report? We think not. In the case of Moore & Taylor vs. Story, 8 Dana's (Kentucky) Reps., 231, in which an Auditor had been appointed to examine the books and accounts of a partnership concern, &c., and to report, &c., the books (nine in number) had been very irregularly kept, and the accounts were (as in this case) exceedingly complicacated. The auditor made his report, but the Court said they "could not rely upon the result of his estimates, *as they had discovered several material errors in his calculations.* Nor can we (said the Court,) *confide in data assumed by him* to arrive at the amount of capital, (a question that had been specially referred to him.) We think the parol proof in the cause, strengthened by the facts deduced from the whole case, may more safely be relied on." So in the case now before us. We cannot (for a similar reason,) *confide* in the *report of the Master* Nickels, and are satisfied that it should not be made the basis of a decree against the respondent  But there are other errors in this report still more important, some of which were corrected in the Circuit Court, and others which we propose to correct here.

It may be proper to remark that we have looked into this report merely as a matter of evidence, to ascertain the fact whether respondent was an accounting party or not—the sole object of this reference to this Master.

In regard to the item in account T., charged as goods sold for promissory notes of individuals, &c., $2,500, the proof is exceedingly vague and unsatisfactory. Indeed, there is no legal proof of any specific amount. The respondent, in his examination before the master Nickels, in answer to a question put to him on this subject, said—We were in the

habit of receiving promissory notes of individuals for goods; don't know the amount, but think it was not large, as we did not do much of that kind of business, and merchandise has not had credit for them. J. W. Russ, who was also examined as to this matter, before the same Master, said that while he was in the employment of White & Walker, as Clerk, they did receive promissory notes of individuals in payment for merchandise, but could not tell how much. In a subsequent examination before the Master Baltzell, he says he remembered some business of the kind being done, but does not recollect any particular transaction, it being confined to limited amounts, and *entries were made;* the notes were put away with other notes of the firm; the practice was not common, the respondent preferring good customers' debts to notes of third persons. F. R. Pittman, who had also been a Clerk of White & Walker, was examined by Master Baltzell, and in answer to a question put to him in regard to this matter, said he did not recollect any such transactions; it was not the practice of the firm, and if any occurred they were small, or he would recollect it more perfectly. M. L. Cavert, another witness, in answer to an enquiry put to him, said—I was in the habit of trading for promissory notes of individuals, and suppose I received five hundred per annum for each of these years, (1841, 1842, 1843 and 1844,) and I think this is a small estimate; and being asked as to the general custom of merchants in Marianna in regard to this matter, said—I cannot say whether it was the general custom of the merchants; I dealt in them myself, because I preferred good notes rather than charge them (goods) in account. Isaac Widgeon, another witness examined, said—I think it was the custom of merchants generally (in Marianna) to sell merchandise for promissory notes on third persons, and that he was in the habit of doing so himself, and on being

asked what amount of such papers per annum would be a fair average for which merchandise was sold in such a busness as White & Walker, (which question was objected to by respondent,) he answered—" I suppose five or six hundred dollars." This is all the testimony on the subject, and we may well lay out of view the testimony of the last two witnesses, there being no rule of law justifying its reception. In the case of Simpson vs. Feltz, 1 Nott & McCord's Ch. Cases, 215, an attempt was made to prove the profits of a firm by showing what profits other merchants in the same neighborhood made, but the Court said :—The evidence in support of the item in the Commissioner's report is very flimsy, weak, and altogether conjectural, being founded on the opinions of merchants in the neighborhood, whose situations were entirely different from that of complainants, they being owners of new cash stores, when that of complainants was a credit store. The evidence of these two witnesses, Cavert and Widgeon, is equally conjectural; indeed, more so. There is nothing at all to show the relative business of White & Walker with any other merchant in Marianna. One, for aught that appears, may have had ten times the amount of stock of the other. Cavert or Widgeon may have had fifty thousand dollars worth; White & Walker may not have had ten thousand. The testimony shows that in 1841 and 1842 their stock of goods was small. One witness says it had been quite low. The respondent, it will be observed, said, speaking of these notes, merchandise has not been credited for them. This he might well say, for other testimony in the case shows that White & Walker did not keep what is called by accountants a merchandise account; but Russ, the principal Clerk of the House, who kept the books, and was intimately acquainted with the transactions of the concern, says—*Entries were made ; the notes were put away with other notes of the*

*firm*. It is very evident, therefore, that the concern had the benefit of them. Indeed, they may, and probably did, constitute a part of the very notes from which the complainant made his selection. And here it may not be improper to remark that the able and astute counsel who closed the argument of this cause for the complainant, while he earnestly contended that merchandise ought to have a credit for these notes, did not charge the respondent with having made any improper use of them, but freely admitted that they had gone into the general fund of the firm, and that it had had the use of them. Apart from this consideration, however, from the view which we have taken of this case, showing an absence of all fraud on the part of the respondent, the amount, from all the legal proof in the case, being but small, would not change the result.

The charge for profits on Union Bank money, seems to have nothing to sustain it. The testimony shows that some of it was received at its face for goods sold, and bought at a discount of fifty per cent.; that it was lent, to be paid in good money, and that it was paid, and that the amount received went to pay the debts of the concern, and Russ, their principal Clerk, who was intimately acquainted with all the business transactions of the House, says expressly in his testimony, taken before the Master, that all these speculations were for the benefit of the concern. There is consequently no reason or pretence for this charge.

The Master's report affords no satisfactory explanation in regard to the item of $2731.75, found on the credit side of exhibit T. He states it thus :—"Sales made to cash which has been paid out to individuals, which I have found charged to them at sundry times in day book, but has not been entered in cash book; therefore merchandise ought to be credited." By turning to exhibit R., we find that this item is made up of 53 monthly items, embracing doubtless di-

vers small sums lent each month, commencing in November, 1838, and running on until April, 1843. This exhibit is headed thus :—" Statement of entries, cash paid out, which are found on day book, posted in journal, and have never been entered on cash book, or to credit of merchandise." In this report he says—" The paper marked R., shows various cash entries on the day book and ledger, which have not been placed on the cash, or anywhere else carried to credit of merchandise." This is all that is anywhere said in relation to this item, except in the examination of the respondent before the master Nickels, to which reference will hereafter be made. It seems from all this that the master assumed the fact that these items had not been entered on the cash book. Why this assumption ? It does not appear to be based on testimony, or even a reasonable probability. We have nothing before us to show that the cash book of this firm was not kept in the usual manner, and if it was, and these items were for cash received in the daily sale of goods, then they must have been entered in the cash book, and merchandise had already been-credited with the amount of them; and the witness, Russ, the principal Clerk of the House, testifies that a portion of the time Pittman, another Clerk, kept the cash book, and *squared it*; that is, we understand, balanced it. Now upon the hypothesis of the Master, we are at a loss to' know how this book was made to balance. The argument of counsel (as we understand it,) on this point was that these amounts were found charged in various accounts of customers, as cash loaned or advanced, and that it was a legitimate presumption that the cash so loaned was taken from the till or drawer, which contained the money received for the daily cash sales of merchandise, and therefore, in order to have full benefit of all the goods sold, it was necessary to enter the amount to the credit of merchan-

dise, in the account T. Now the objection to this item, as it stands in the Master's report, is that his assumption that these items were never carried to the cash book is a mere assumption, unsustained by proof, unless it is to be found in the answer of the respondent to a question propounded to him upon his examination before the Master, and not within the bounds of a reasonable presumption, and we think that to fix a charge of fraud upon a party, we ought to have something more than the mere assumption of facts.

The objection to the explanation offered in the argument of counsel, viz: That it afforded an index of the amount of merchandise sold for cash, is equally unsatisfactory; for, *non constat*, that the money so loaned to customers was collected from other sources than the daily sales, as for settlement of accounts previously contracted by other customers, or taken out of moneys already entered in the cash book, and which had passed into the general fund of the concern, and other monies, collected from various sources, and placed in the same fund, which is much more likely. Fraud, as before stated, is never to be presumed, but must be proved; but if facts may be assumed, and made to rise to the dignity of testimony, this sound, salutary and equitable rule of law may very easily be evaded. The question propounded to the respondent, to which his answer above referred to was given, is as follows, viz: " I find many charges of cash entered on the day book which have never been entered on the cash book ; how are they to be accounted for, and to what account are they to be placed ?" To which the answer was : " I *presume* merchandise ought to be credited with the amounts." Here, in the question put, is to be found again the same assumption. It is a mere general question ; the attention of the witness is not called to any particular item ; but without any particular item being brought to his notice, he is called upon to answer to

a series of items, amounting doubtless to several hundreds, and running through a period of four and a half years, and this, too; eight years after these entries commenced. Can it be supposed by any reasonable man that he could, when thus suddenly interrogated, recollect all or even any considerable portion of these numerous items, so as to be able to answer understandingly in regard to them? Surely not. The clerks of the house, it appears, made most of the daily entries. These items were small; although amounting to considerable in the aggregate. It is not probable, therefore, that his attention was ever very particularly called to them; and hence the general and necessarily unsatisfactory language of his answer—"I presume," &c. Nothing more than mere presumption could be expected in an answer founded entirely on an assumed fact. To what weight, then, is the answer entitled? It would seem that it should not be permitted to outweigh the defendant's answer, which is responsive to the bill, and the testimony of Russ, the principal Clerk of the House, who states in substance that the books were justly kept, and all the entries in them *bonâ fide*, and honestly made.

As to the sum of $4,080 for bad debts, it is deemed sufficient to say that this item is set up in the answer responsive to the bill, that it was allowed by the Court below, and has not been objected to here, even by way of argument.

We insert here a statement showing the difference between the exhibit made by White to Walker at the time of the purchase of his interest in the partnership business, and the actual condition of the business, as shown by the Master's report, after being corrected by this Court.

White's exhibit, made to Walker at the time of sale, viz:
Good assets over and above the debts due by
    the concern, and including the private ac-
    counts of the copartners, .................. $19,985 33

| | | |
|---|---:|---:|
| Bad assets reported,....................... | 4,080 | 00 |
| Total assets due concern, over and above its liabilities, ....·····...................... | 24,065 | 33 |
| Balance reported by Master, in account of profit and loss, ......................... | 30,872 | 67 |
| By item in account designated as "sales to cash paid out to individuals,"............. | 2,731 | 75 |
| By item in account, "Goods sold for promissory notes,"............................. | 2,500 | 00 |
| By item in account, profit on Union Bank notes loaned to T. M. Bush,................... | 935 | 00 |
| By item in account, profit on Union Bank notes loaned to Wynns,....................... | 660 | 00 |
| | $6,826 | 75 |
| Total balance, as corrected by this Court,˙.... | 24,045 | 92 |
| Balance in favor of White's exhibit,......... | 19 | 41 |
| To gross balance due partnership, as per above statement,............................. | $24,045 | 92 |
| By amount allowed for bad debts by the Circuit Court,............................. | 4,080 | 00 |
| Nett balance, to be divided in equal moities,... | 19,965 | 92 |
| Nett balance due to each partner,........... | 9,982 | 96 |
| Amount of cash and selected notes received by Walker,................................ | 9,009 | 00 |
| Excess in favor of White, consisting of assets remaining after the selection by Walker of his portion,........................... | $873 | 96 |

It is insisted by the complainant that the decree of the Circuit Court is erroneous in this: That it does not allow him for the cash which he contributed as capital stock, with which the firm commenced business, and that this ought to be added to the amount decreed in his favor. This claim of the complainant we have maturely consid-

ered, and think that it is without foundation. The basis of the decree of the Circuit Court is the balance struck in account T., which purports to be a " profit and loss" account, but which is in fact only a " balance sheet" showing the difference between the assumed disbursements and receipts of the concern. To convert it into a " profit and loss" account, it was necessary to carry to the " debit side of the account" the whole cash capital invested, and this, if it had been done, would have reduced the balance by that amount, and would then have exhibited the clear " profit" (as the Master understood it,) over and above that capital. Admitting the position claimed by complainant, the account between the copartners would stand thus :

Balance reported in account T.,.............. $30,872 67
One moiety, or Walker's half,... $15,436 33
Add for cash contributed to cap-
    ital stock,.................. 2,757 25—$18,193 58

Balance to be received by White,........... 12,679 09

Thus it will be perceived, upon the hypothesis on which the complainant's claim is based, of two copartners contributing equal portions of the cash capital, and to participate equally in the profits, one receives from the nett assets of the concern $18,193.58, while the other gets only $12,-679.09. To meet a result so obviously inequitable, it was insisted by the counsel for complainant that $2,757.25 was to be viewed as coming not out of the nett assets of the concern, but as due by White, the acting partner, who had received it from Walker at the time of entering into the copartnership, and that he ought to be required to refund it out of his private funds. It is true, White did receive the amount, as Walker's portion of the cash capital, but it is equally true that he disbursed it for the purchase of merchandise, which very merchandise is debited in account T.,

and the proceeds thereof, when sold, carried to the credit side of the same account. Now if White is to be debited with the cash received, he must likewise be credited with the amount when paid out for merchandise, and the two amounts being equal, they balance each other, amounting to a cross entry, which could not in the least affect or vary the balance stated in the account. We should not have deemed it necessary to expend an argument upon this point but for the very earnest manner in which it was pressed upon us by both of the able counsel who represented the complainant. We cannot but believe that they have been led into an erroneous conception of this matter, by viewing the result exhibited in account T. as " *clear profit*," when it was in fact only the " *balance*" between the " *receipts* and *disbursements*" of the concern ; and indeed, the designation of that account might well induce the misconception. We are perfectly satisfied that there is no error in the decree of the Circuit Court in rejecting this item of claim. The view which we have taken of the case, in the former part of this opinion, and the conclusion to which we have come upon the whole case, renders it unnecessary to consider the other claims set forth in the complainant's petition of appeal. Upon a view of the entire case, it is gratifying to us to perceive that our conclusion upon the details is strongly fortified by the general result, based upon the evidence of the witnesses examined to the point of the average profits realized by other mercantile houses during the period that this firm was in operation. The weight of evidence on that subject seemed to establish fifty per cent. advance on the sale of goods as the average. If we assume this data as the basis of our calculation, (and we are inclined to the opinion, from the disasters which attended the majority of the mercantile firms doing business

at that period, that this average is a very high one,) the re-sult will stand thus :

Amount of merchandise bought during four
and a half years, the period of doing busi-
ness, (in round numbers,) ................ $44,000 00
Fifty per cent. advance on cost is ........... 22,000 00
Deduct for bad debts ..................... 4,000 00

Leaving good assets to be divided, ........... $18,000 00
One moiety of good assets, ................. 9,000 00
Which is in round numbers the amount the complainant received for his interest in the concern when he sold out to White—a result with which we think complainant has no cause to be dissatisfied, when we reflect that he embarked in the enterprise only the sum of $2,757.25, and in the brief period of four and a half years had returned to him, in cash and the *selected* assets of the concern, the amount of $9,009.00. A result so satisfactory, and achieved through the perilous periods of 1840, 1841 and 1842, is in our esti-mation the highest compliment which could be paid, not only to the business capacity, but to the honesty and integ-rity of the respondent. Let the decree of the Court below be reversed, and the cause be remanded to the Court below, with directions to dismiss the bill ; and as to the costs, we deem it right and proper that under the circumstances each party should pay one half the costs, and accordingly so decree.

As a general rule, *prima facie*, the prevailing party is entitled to costs, as well in equity as in law. 3 Daniels' Ch. Pr., (by Perkins,) 1520, and notes. Yet costs do not al-ways follow the decree in favor of a party ; they are in the sound discretion of the Court, and are to be awarded or refused according to the justice of each particular case. Ibid, 1515, 1516, and note and case cited. In Jones vs.

Morehead, &c., 3 B. Monroe's Reps., it was held that in a case where suit was necessary to wind up the partnership, it is proper to divide the costs. In Taylor vs. Cawthorne, 2 Dev. Eq., 221, it is said costs are usually taxed on partnership effects. In the case of Simpson vs. Feltz, 1 Eng. Cond. Ch. Reps., 213, 219, the plaintiffs, in a suit for a settlement against a co-partner, were ordered, under the circumstances, to pay two-thirds of the costs. A very large portion of the costs, had the respondent (the appellant here,) taken the proper steps at the coming in of the report of the Master Nickels, to get rid of all that portion of it which was beyond the scope of his authority, (which he failed to do,) might have been saved ; and he is at fault in relation to other matters, which tended to increase the costs, and especially in the great and unnecessary length of his answer.

Therefore let one half the costs be taxed against each party, both in this Court and the, Court below. *Per totam Curiam.*