BENJAMIN CHANDLER, APPELLANT, VS. GEORGE W. SHERMAN, APPELLEE.

1. It is the duty of a partner, to whom is entrusted the management of the books, to keep precise and accurate accounts of all his transactions for the firm. He should have the books always ready for inspection and examination, and his conduct should be consistent with fair dealing and good faith.

2. One partner may exercise such powers and make such contracts as are appropriate to the business in which the parties are engaged, and within the customs and commercial practice thereto appertaining. A contract clearly beyond such powers, customs and commercial practice, cannot be sustained as against the firm, unless it is made with the consent of the other partner. Hence, where the aggregate amount of the capital contributed by two partners is the sum of $16,000—one contributing $9000, the other $7000—neither partner has authority, without the assent of the other, to borrow the sum of $2000 from a third party, agreeing to pay therefor twenty-five per cent. of the net profits of the concern. Where, in such case, the one partner avers the assent of the other, he is held to strict proof of the same.

3. Two partners agree that either of them may take a certain proportion of the property, within a fixed time, at a certain valuation. This contract being executed by one of the parties taking possession within the time fixed, the other cannot insist upon the price which the partner taking the property received for it from a third party. He is restricted to the agreement.

4. Where the firm has purchased the interest of a third partner, and has paid a large proportion of the purchase-money, the managing partner of the concern cannot, without the assent of the other partner, debit himself in the accounts of the new firm with its debt to the retiring partner, and claim a proportionate share of the assets of the old firm. The balance of the debt to the retiring partner is a debt of the new firm, and the account must be so stated. Even if the retiring partner has accepted the managing partner as his exclusive debtor for the balance, the managing partner would be entitled to nothing more than such credit as would follow the payment of an ordinary debt of the new concern.

5. In the absence of a special agreement, one partner's accounts with the firm cannot be charged directly against his contribution to the capital, the other partner's individual account being charged up in his general

account with the firm. The same rule must control in each case. The proper rule is to charge each sum in the individual account with the firm.

6. Five dollars per day is not an exorbitant or unusual allowance for the services of an accurate, competent and industrious accountant and master. The Circuit Court having found the time employed, and there being no satisfactory testimony to the contrary, this Court must approve such finding. It is the duty of the Judge to see that he does not allow for more labor than has been properly performed.

7. Where neither partner is blameless, the costs should be divided among the parties in a suit for dissolution and an account.

Appeal from the Circuit Court for Escambia county.

Sherman was complainant in the cause. The facts of the case are stated in the opinion of the court.

*A. E. Maxwell* and *W. A. Blount* for Appellant.

*G. A. Stanley* for Appellee, Sherman.

*C. C. Yonge* and *G. P. Raney* for the Master.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

This is a bill brought by one partner against another for dissolution and account. The bill alleges the formation of a partnership for the purpose of prosecuting the business of sawing lumber; that the business was carried on for some time, when the mill was destroyed by fire; that upon its destruction plaintiff advised defendant that he was unwilling to continue the business longer, and requested that the business be wound up, and a statement had, to which request defendant refused assent; that shortly thereafter he (the defendant) left the State, and upon his return found that the defendant had taken possession of the property and mill site, and had formed a new copartnership with other parties, excluding him from any participation therein; that defendant refuses to come to an account as to the partnership transactions. Plaintiff prays for dissolution, for an ac-

count, and for a decree for whatever may be found due him. Defendant interposed a demurrer to the bill. This demurrer is overruled. Defendant than filed an answer denying the charges of exclusion, of refusal to account, of all improper conduct, and submitting to and requesting an account between the parties. There was an interlocutory decree for reference to a master to state an account.

To the report of the master there were exceptions by defendant, and there was also objection to the amount allowed to the master for his services by the court. Some of these exceptions were sustained by the court, the master's charge was allowed, and there was a decree against the defendant for the sum found due to plaintiff, and for all costs.

The first ground of appeal is the judgment of the court overruling defendant's demurrer to the bill. Waiving the question whether pleading over after this judgment upon the demurrer was not an abandonment or waiver, it is clear that the demurrer was properly overruled. The principal and necessary instrument by which the business was to be conducted (the mill) was here destroyed. As to the remaining property, the allegation is that it was taken possession of exclusively by the defendant, and was being used in other enterprises not connected with the joint interest of the parties. The plaintiff also alleges a refusal to account and the refusal of the defendant to give him access to the books of the concern. It is unnecessary to cite any authorities to show that these facts canstitute a ground for a decree of dissolution and for an accounting.

The next ground upon which a reversal of the decree is sought is the judgment of the court overruling the exceptions of the defendant to the master's report, and the allowance of five hundred dollars as compensation to the master.

The first exception of the defendant to the report of the master was " because of the refusal of the master to allow a credit of $3000 to him for that amount paid Mrs. White-

sides on account of the firm, as shown by the evidence."
The decree of the court as to this exception was that it be
"sustained so far as to allow interest on the sum of two
thousand dollars borrowed from Mrs. Whitesides by the re-
spondent, at the rate of eight per cent. per annum from the
time the same was borrowed until payment of the same, in-
stead of the allowance for interest claimed by respondent."
The testimony upon this matter is substantially as follows:

George W. Sherman, the plaintiff, states: "After my re-
turn from Virginia after the mill was burned, and about the
third of September, A. D. 1872, I met Mr. Chandler, the
defendant. I requested a settlement. He said he had used
my money, but would have it in a short time. I waited
for three months. I called on him at his house. He said
he wanted to call my attention to a matter. He asked if I
recollected his having borrowed $2,000. I told him I recol-
lected a conversation that passed between us at the time
he said he borrowed the money. I asked him to let me have
the books; he said you can't have them; I demanded them.
He replied you shan't have them. It was the agreement in
the copartnership that he should have the control and cus-
tody of the books. I knew nothing of book-keeping. He
never asked me to come to an account. I told him I
wanted the books to have them posted. Mr. Chandler sub-
sequently, and after the commencement of this suit, placed
the books in the hands of my attorney." When asked what
occurred between him and Mr. Chandler as to the alleged
loan of $2,000, he says: "Sometime in 1868, when we had
been running the mill about three weeks, he said he had
found out where he could get some money. He could get
some from Mrs. Whitesides. I asked him what per centage.
He said she agreed to lend it to him for his accommodation.
He did not tell me what per centage. He asked me should
he take it. I asked him if we needed money. He said yes,
very badly. I then said if we could get the money at any

reasonable per centage we had better take it. Nothing was said at that time, or at any time prior to the burning of the mill, about one-fourth of the net profits as interest on the money. The first I ever heard of this was at his house, after my return from Virginia, and after the mill was burned. He said nothing about borrowing on his own responsibility. I understood he was to get the money for the firm. The mill could not have been started without the use of some money at this time. Neither at that time nor at any time before did he say anything further as to the loan of $2,000, or that the firm was hopelessly embarrassed. At no time, until I visited Mr. Chandler at his house after the mill was burned, did Mr. Chandler inform me what per cent. was to be paid for the $2,000. I don't know who repaid this money to Mrs. Whitesides, or that it ever was repaid. Mr. Chandler attended to the financial part of the business; I left it to him entirely. Mr. Chandler said he had paid it with one-half of an undivided half of a tract of land that was owned by Mrs. Whitesides and himself. I was at no time advised of the valuation at which Mrs. Whitesides agreed to accept this land in payment of the debt due her; I only know what Chandler told me. Mr. Chandler, after the burning of the mill, fixed the net profits at 20 or $25,000, and claimed one-fourth of it. We had several conversations in reference to the matter of settlement. No adjustment of the books was made prior to that by Jordan. At no time did I consent or agree that Mr. Chandler should borrow money of Mrs. Whitesides or any other person, the firm to pay twenty-five per cent. of the net profits made by the mill. When the conversation occurred between us on this subject, I think the mill had been burned for two or three weeks. I do not know at what rate money could have been borrowed at the date of this loan, or that it was difficult to borrow it at any rate of interest. I would have preferred to stop the mill at the time than to have paid a heavy interest.

The prospects of the profits of milling were not in my judgment such as to justify it. I would have paid one per cent. per month, but not 1½. Mr. Chandler said that the mill was embarrassed financially at that time. The use of this money enabled the concern to relieve itself of embarrassment. When the mill was burned we were about easy. At one time after the mill had stopped, Mr. Chandler had a conversation with a man from Kentucky about some money. After he left Mr. Chandler said to me, 'What do you suppose that man wants for his money?' I said I do not know. Chandler said he wants 25 per cent. of the net earnings of the mill. He must think I am a damned fool. He would own the mill in three years."

Robert Jordan, for the plaintiff, swears that he was the book-keeper of the concern from about February, 1869, up to the time when the mill was burned, and that he was employed in May, 1872; that on May 21, 1873, he made out a statement showing the real assets and liabilities; the partners placed the books in his hands to make a statement of the real assets and liabilities of the firm as a basis of settlement. There was at this time no charge on the books against the concern for $3,000 due Chandler for interest. In the month of May, 1873, such a charge is entered in the handwriting of Mr. Chandler. At that time there were no outstanding liabilities of the firm other than stock liabilities. At the time this statement was made, Mr. Chandler claimed interest on money advanced the firm. I can't say that Chandler at that particular time spoke of it as money borrowed by him for the firm on which he claimed the interest. At another time he spoke of having borrowed some money on which the firm was to pay a large interest. I do not think Mr. Sherman was present at this time." When asked whether he knew of any $2,000 borrowed by Mr. Chandler for the firm, he states: "I know he borrowed some money, but do not recollect the exact amount. I don't think I was

ever called upon to enter $2,000 to the credit of Mr. Chandler. I do not recollect of ever having heard, prior to the burning of the mill, of any agreement by Messrs. Chandler and Sherman to pay a party twenty-five per cent. of the net earnings of their mill business for the use of $2,000 loaned them, but have heard so much about it since that I am not prepared to swear that I did not. Previous to February, 1869, the mill stopped operation from embarrassment. The firm was in debt about $5,000 in February, 1869. The mill had been in operation a short time. The mill had been leased for twelve months before that time on account of financial embarrassment. Mr. Chandler gave me the money to commence operations. I do not know where it came from. The ledger shows $3,068.94 as paid into the concern by Chandler between January 1st and April 19th, 1869."

J. D. Wolfe for the plaintiff:

He is asked to state what occurred between him and defendant after the matter in controversy was placed in his hands by Mr. Sherman. He answers: "I sent for Mr. Chandler, who came. I told him that nothing could be done until I had an opportunity of examining the books. He said he would bring them. He did bring them, a ledger and journal. After examining the books and balance sheet as made out by Mr. Jordan, I told him that I saw no reason why the matter could not be settled, and proposed to him an amicable arbitration, which he assented to, but said that he was going up to Choctawhatchee and would take the books with him, and when he came back he thought we would settle it ourselves. There was no mention made by him of $3,000 for interest, or any other claim outside of the books as they then stood. After a considerable length of time he brought the books back, and then for the first time I heard from him this claim about interest. I told him at once that I could not allow it without a contest. He then

refused to arbitrate. Upon an examination of the books, I found a number of entries beside the one for $3,000 had been made by Mr. Chandler after I gave him the books. I immediately brought suit, and upon application made to me by Mr. Chandler for the books I told him that under instructions from my clint, as the case then stood, and in view of the entries he had made, I could not deliver him the books. The following, as near as I can recollect, are the additional and new entries." The witness then gives some entries. It is only necessary to insert one here as bearing upon this exception :

" To B. Chandler—Am't paid on money borrowed, $3,000."

Benjamin Chandler, the defendant for the defendant, swears : " The partnership of Chandler and Sherman was formed in January or February, 1866, Hale, Sherman and myself being the partners. I obtained the loan of two thousand dollars from Mrs. Whitesides, upon pledging one-fourth of the net profits of the mill until repaid. I advised with Mr. Sherman for days, I think weeks, in reference to the matter. I told Mr. Sherman about the terms, viz: twenty-five per cent. of the net profits. He consented to it, and said it was better than paying a heavy fixed interest. He urged me to make the loan. We ran the mill successfully after that nearly two and a half years, paying off its old debts and leaving a surplus. The book-keeper estimated that we had $12,000 after paying all debts, consisting of cash, lumber, and debts due the firm. I repaid the money borrowed from Mrs. Whitesides. I paid $5,000. I claim $8,500. This is made up of the estimate of one-fourth profits of the mill and the two thousand dollars borrowed from Mrs. Whitesides. I had already been credited with the two thousand. I had full conversation with Sherman upon this subject. I remember distinctly that he asked me if I would not be satisfied with legal interest. To which I replied no ; that I had purchased the claim in good faith and

expected all that it would yield me. This all occurred before the middle of January, 1873. About the latter part of March or April I told him that upon a proper settlement between us I was prepared to pay him anything that might be due upon the basis of my having credit for the proceeds of the loan obtained from Mrs. Whitesides. To this he objected, and the interview ended." There is no written evidence of any agreement with Mrs. Whitesides. This witness being asked, "why did you enter a credit to yourself of three thousand dollars in the Whiteside transaction at the time you did, although you claimed more?" answered: "After Mr. Wolfe had the settling of this business for Mr. Sherman, he sent for me to talk to me on the subject. He said he thought there would be no difficulty in our arriving at an adjustment of the business, and in speaking of the loan we made he said I would be entitled to all I had paid for the loan and no more. Wishing to get the matter settled without a suit, I determined to accept the amount I had actually paid for the claim, trusting that that would lead to a settlement without a suit, and concluded to accept the $3,000 as interest, and entered it in that way on the books; but I believe that I was fully entitled to the quarter of $25,-000. The matter of difference between us had been as to what should be charged on that account. It was after Mr. Sherman had placed his business in the hand of an attorney that the entry for three thousand dollars interest was placed by me to my credit in the books of Chandler, Sherman & Co., about one or two weeks before legal notice of suit was given me." *Question*—"You have heard Mr. Wolfe's testimony; leaving out the $3,000, state whether the entries referred to are correct, and the amounts properly charged and credited? *Answer*—They are. *Question*—State when and under what circumstances you made all these entries, including the $3,000? *Answer*—The entries were made after having had several interviews with Mr. Wolfe on the

subject of a settlement, and with a view of having every necessary entry made before I exhibited the books to Mr. Wolfe, expecting that that would be a basis of settlement from what had previously occurred between us." This witness states further, that when these entries were made Mr. Wolfe had never seen the books: "After I carried the books to Mr. Wolfe, I never had them in my possession. I state positively that I never had these books in my possession after I placed them in Mr. Wolfe's hands." As to the value of the land which the witness states he exchanged with Mrs. Whitesides for her claim against the firm, he says: "I repaid Mrs. Whitesides the $2,000 by the sale of a tract or parcel of land in Tennessee, on the top of Lookout Mountain. I considered the land worth the sum of $5,000; I had held it at $6,000. It was about 100 acres of unimproved land. I had a joint interest with Mrs. Whitesides. I purchased the land of Spencer Rogers in connection with other property. I paid for the whole between thirty and forty thousand dollars, money due me by Mr. Rogers. The whole tract was estimated at 500 acres. My agreement to sell this land to Mrs. Whitesides was made by written correspondence. It was a place of great resort in the summer, there being a large hotel near it. The land commanded a most beautiful view from the top of the mountain, being eligible for building sites. It joined what was called the hotel lot. The land is comparatively level. I do not think it worth what I gave Rogers. I gave him that on his own debt, because I could get nothing else. Mrs. Whitesides told me she had conditionally sold this land for as much or more than she paid me for it." This witness states that while he was in no way connected or related to Mrs. Whitesides, yet that there was a particular friendship existing between himself and her, as his wife and she were brought up together. He states also that the evidence of indebtedness given to Mrs. Whitesides was letters

which passed between them in regard to it, and that he cannot remember whether these letters contain the evidence of the amount of the loan and the rate of interest, as the negotiation was made partly through her daughter, who was then at his house, and that there is no written evidence of this agreement that he had any knowledge of. Under this evidence and the entries in the books, the court found that defendant Chandler was entitled to a credit for the sum of $2,000, the actual amount borrowed from Mrs. Whitesides for the firm, allowing interest thereon from the time the same was borrowed to the date of payment.

The ground of Chandler's exception is that the court failed to allow him a credit of $3,000 interest on this sum, the interest he claims to have paid Mrs. Whitesides; at the same time claiming that he was really entitled to $2,000, the amount of the loan, and to $6,500, which he says was a quarter of the net profits. Laying aside the claim for $6,500, which is not insisted upon, we must say that $3,000 interest on a loan of $2,000 for two years and six months is very extraordinary, and is entirely outside of a regular or usual course of dealing. Sherman swears that he gave no authority for the payment of such interest, and that all that he did was to consent to borrow the money at a reasonable rate of interest. No entry of it appears upon the books of the partnership until long after the operations of the firm had ceased. Wolfe says this entry was made by Chandler after the books had been in his (Wolfe's) hands as attorney for Sherman, and when a suit was imminent, that Chandler in his conversations with him made no claim of $3,000 for interest, or any other claim outside of the books. The person who was the book-keeper of the firm during the time the loan was made cannot say that he recollects any such loan, and Sherman swears that Chandler made no such claim until after the mill was burned. In May, 1873, this book-keeper makes out a statement of the

real assets and liabilities of the firm at the request of the parties, and no charge against the concern for the sum of $3,000 for interest was on the books, nor did Chandler then insist upon its being placed in this statement. Chandler, on the other hand, swears that this contract to pay a quarter of the net profits was made by him with the consent of Sherman; denies positively Wolfe's statement that the $3,000 entry was made as he states, and affirms that he paid Mrs. W. the $5,000 by conveying to her his interest in a tract of land estimated to be worth that sum. He states further that the evidence of the debt due to Mrs. Whitesides was letters which passed between her and him in regard to it; that he cannot remember whether these letters contain the evidence of the amount of the loan and the rate of interest, as the negotiation was made partly through her daughter, who was then at his house, and that there was no written evidence of this agreement so far as he knew.

Under this evidence, the court very properly restricted the credit of Chandler to the actual amount of the loan, with interest thereon, as shown by the books before this dispute originated. An elementary principle resulting from the confidential relation of partnership, invested as each partner is with power which may involve the estate of all, is that it is the duty "of each partner to keep precise accounts of all his own transactions for the firm, and to have them always ready for inspection and explanation." The law requires fair dealing and the utmost good faith between parties occupying such confidential relations. This is a leading principle, controlling the action of the courts in such cases.

Chandler was the active business manager of the firm. Sherman was unfamiliar with book-keeping, and left the whole matter to him. Upon the books kept by him and under his control at the time this difference commenced was

an entry of $2,000 to his credit. This was the amount ad-mitted by him to have been received of Mrs. Whitesides. How it was paid, if it was paid otherwise than in cash, is not disclosed by the books, and the necessary result of the entry made by him or under his supervision was that he was entitled to a simple credit for this amount with interest thereon. This the court has given him, and under the cir-cumstances of this case he should have no more. Sherman denies positively Chandler's authority to make any loan, ex-cept at an ordinary rate of interest. The books show noth-ing more. Chandler's evidence being in conflict with both the books and Sherman's testimony, as well as with the statements of Wolfe as to the entry of 3,000, it should be rejected. The court did not believe in the existence of the Whitesides contract; or if it did believe in its existence, it did not think it *bona fide;* or if it did believe in its exist-ence, and that it was a contract made in good faith, then it held that it was beyond the power of Chandler, without the assent of Sherman, thus to bind the firm. We do not see where the court erred if. it entertained either of these hy-potheses. Chandler himself, when interrogated closely, knew of no written evidence of such contract, and states that the business was transacted partly through the daughter of Mrs. Whitesides, who was an intimate friend of his family, resi-ding then with them; and the evidence shows conclusively that Chandler, when in debt and embarrassed, made false entries of credits of stock to Mrs. Whitesides in order to pro-tect his interest in the mill from his creditors.

Again, one partner may, for the firm, do such acts and exercise such powers as are appropriate to the business in which the partners are engaged; but such excess in the ex-ercise of power and authority as involves an act which is neither appropriate to nor within the customs appertaining to the particular business in which the partners are engaged, will not bind the firm under the circumstances of this case.

According to Chandler's construction of this contract, Mrs. Whitesides was to have twenty-five per cent. of the net profits during the continuance of the partnership; for that is his claim. Her interest was to vary according to the amount of the net profits, while the principal sum was to be a loan. This was really allowing a greater interest in the net profits than would have been the sum coming to her had she been admitted a partner, to share according to her contribution. Such a contract is beyond the power of a managing partner. 14 John., 318; 1 Whar. (Penn.), 380; 16 La. An., 418; 20 Ind., 110.

Chandler contributed to the capital here the sum of $9000, Sherman the sum of $7,254, and by this contract, if sustained, Mrs. Whitesides, for a contribution of $2,000, is to have one-quarter of the net profits resulting from the use of over $18,000. While one partner, it is true, may borrow money for the firm, still such borrowing must be upon terms in some manner corresponding to the customs and usages of the particular business according to usual commercial practice. There must be some limit, and if there is any, which no one doubts, then this case is certainly beyond any reasonable limitation.

This disposes of the first exception.

Appellant's second exception to the master's report is "because of the charge made by the master against him of $5,000 instead of $3,000, as the purchase price of the mill property, according to agreement between Sherman and Chandler." This exception was overruled by the court, and this action is here for review. The testimony as to this matter is as follows:

Plaintiff Sherman testifies "that Exhibit C. is the agreement executed by Chandler and himself as to the matter therein mentioned. This agreement is as follows:

"Agreed by the undersigned, to be confirmed by the other partner, that either partner shall have the privilege for sixty

days of taking on his own account the following property, belonging to the firm of Chandler, Sherman & Co., viz: the water front purchased from Blount & Knowles, with the improvements thereon, together with all of the machinery, boilers and scrap iron now on the premises; also, four lots purchased of R. L. Campbell, and one arpent lot purchased at mortgage sale from Holmes, being arpent lot number 83, in Pensacola; also the cart and mule now belonging to said firm.　　　　　　　　"B. CHANDLER,

"GEO. W. SHERMAN.

"August 31, 1872.

" Witness :

"WILLIAM GOULDING, ⎱
"B. F. FAUST."　　　　⎰

- " This agreement was made one day before I went to Virginia. The property was' to be taken at the valuation of $3,000. I had not urged a final settlement before I went to Virginia. My understanding and agreement with Mr. Chandler was to put in the mill site at $3,000, he to make an immediate settlement and pay me my money. I would not have valued it at $3,000 if I had known there was to be a credit. I was absent, in Virginia, two months. I returned the third of November. I was in Virginia or on my way here at the expiration of the sixty days. I do not know that this agreement was ever confirmed by the other partner. It was my understanding that when the business was settled, any balance coming to me was to be paid. Mr. Chandler did not, within sixty days after thirty-first of August, notify me that he would take this property. I do not recollect that Mr. C. advised me that he had taken possession under that agreement; when I returned he was at work on the mill for himself, in possession of the property, and I made no objection to his operations."

Defendant and appellant Chandler testifies that when the agreement (Exhibit C.) was made out, not a word was

8

said about this being done on condition of an immediate settlement. The balance of the evidence here shows the valuation at which this property was put into another firm by Chandler after he had taken possession of the same. It is unnecessary to insert it, or to say more than that the valuation was $5,000 instead of $3,000, the valuation agreed upon between Sherman and Chandler.

Sherman's position here is that this contract and agreement was based upon the condition of an immediate settlement; that Chandler came to no such settlement; that the property for that reason remained partnership property, and that Chandler should be charged for it the amount that it was valued at when he entered into the subsequent firm with a different party. Upon the face of this agreement, coupled with the admitted understanding as to price, we can see no room for doubt as to the proper conclusion to be reached. Either party was " to take " the property " on his own account." He was to have this privilege for sixty days. Chandler did so take it, and he is to be charged on his own account the sum agreed upon, and no more.

There is nothing in this agreement as to an immediate settlement of accounts between the parties and the payment to Sherman of " his money." Indeed, in one place, Sherman in his testimony, says: " Before I went to Virginia (which was the time when this agreement was executed) there had been no request or urgency on my part for a final settlement of the partnership business." After the expiration of the sixty days, and when Chandler had taken possession, Sherman, who in the meantime had been absent in Virginia, returns. He finds Chandler, as he says, in possession of this property " for himself." He states that he made no objection. The contract was executed, and Chandler, under his agreement, took it " on his own account." He is properly chargeable with the sum of $3,000, and no more.

The third exception was sustained by the court, and nei-
ther party objects here to its action in this respect.

The fourth exception, which was overruled by the court,
was " because of errors in treating the assets of the firm not
as assets of Chandler, Sherman & Co., but as belonging in
equal shares to Chandler and Sherman, and in allowing
Sherman an interest in the partnership share of Wortham,
which was the individual property of Chandler by purchase
from Wortham.

This exception is based upon the hypothesis that Chand-
ler, having purchased one-fifth of the interest of a third
partner, the four-fifths having been purchased by the firm
of Chandler and Sherman, he must stand in reference to
that interest in the same situation as the third partner would
if he had reserved one-fifth of his interest in the partner-
ship, and that the account should have been stated as an
account with Chandler, Sherman & Co., there being this
outstanding interest of a third party, before then being one
of the firm.   The entry of the master here is a credit to
Chandler of $500, " to be paid Wortham."  Chandler and
Sherman are charged with this sum by the master as a debt
due by them to Wortham, which Chandler had assumed,
and Chandler gets a credit for it in his account with Chand-
ler and Sherman.   The question here is, was this purchase
of the interest of Wortham made by Chandler and Sher-
man, or was it an individual purchase of Chandler?  If this
purchase was made by the firm, then Chandler is entitled to
no credit for the firm debt.  It is unnecessary to go into
any lengthy and detailed statement of the evidence upon
this subject.  It establishes that the purchase of the interest
of Wortham was made for the firm; the firm paid $2,000
upon it.

It seems to have been an after thought of Chandler to
make himself the owner of the remaining one-fifth interest
by attempting to assume the balance of the debt of the firm

without the assent of his copartner. There is nothing in this record which shows that Wortham has accepted Chandler alone as his debtor, or that Sherman has consented to such proposition. The sum to be paid Wortham is a debt due by the firm, and not a debt "to be paid" by Chandler. Chandler cannot thus at will and pleasure assume debts due to others by the firm, when such action may, in his judgment, give him, without even payment, an advantage against his copartner.

The fifth exception is "because of error in Exhibit H. in the several items therein debited to Chandler, especially in items 1, 2, 3, 6, 8, 9, 10, 11, 12, 13, 19, 20, 21, and the interest item, and because of error on the credit side of said account of $500 to be paid to Wortham." This exhibit is Chandler's individual account with Chandler & Sherman. It appears from the evidence that the sum total of Chandler's private account was $3,545.22, and that of this $2,058.93 was charged against the stock account of Chandler, and $1,486.29 was charged to his individual account. All of Sherman's individual account with the firm is kept separate from his stock account. In the absence of a special agreement to that effect, this difference in the treatment of accounts of partners cannot be sustained. The proper entry for this indebtedness of each party is in his individual account with the firm. It is no proper charge against the stock account of either party. The second item is a charge of Chandler for $309.75, and a credit of stock account with that sum. This item originates in this way: The original stock contributed by Chandler was $9,003.18; the stock contributed by Sherman was $7,254.00. Chandler was charged with $2,058.93 (which was his individual account) in stock account, thus reducing his stock to $6,944.25. Sherman's individual account was not charged to his stock, and there was, therefore, a difference in the stock accounts of the parties of $309.75. All of this is wrong. The indi-

vidual account must be kept separate from the stock account. The only question here is, whether the interest of these parties in the concern was equal, or whether they were to share according to capital contributed? If it was to be an equal copartnership, notwithstanding a difference in the amounts contributed, then there is a simple division of the excess, charging each individual in his account with the firm with the advances received. If the share was to be in proportion to capital contributed, then the distribution is to be made with reference to that view. As this case must necessarily be remanded, all of this matter may be considered and the necessary changes in the accounts made. The next item in this account to which appellant excepted was item 6. This charge made by the master is for a " collection on account of Holmes' lot, $339." It appears from the evidence that this lot was received from Holmes by Chandler for a debt due by Holmes to the firm. It was, therefore, simply an asset of the firm. Chandler subsequently purchased it under his agreement. This item must be stricken out as a charge against Chandler. Item 8 is for a " collection as follows, from B. F. Simmons, $500." It is a proper charge against Chandler. He admits that it was settled in full, and does not deny that this settlement was by him, and when asked what accounts Sherman collected, restricts Sherman's collection to one account (Avery's). Item 10 is for amount collected of J. W. Chandler, and is upon the same footing as item 8. The interest item, $756.66, is interest upon $5,000, being what Sherman claims of Chandler for mill site, &c. (See what is said as to this matter under second exception.) Chandler is properly chargeable with $3,000 in this matter, and the interest must be upon this sum. The next exception is to a charge for interest on $2,697.30 for two years. The ground of the exception is that this sum is the aggregate of many sums collected by Chandler at various and different dates, and that interest

should be charged upon each item and not upon this sum total. This view is correct. The master should have charged interest on each sum as collected, wherever interest was properly chargeable. The next and only remaining matter for consideration here is the action of the court in allowing five hundred dollars to the master in adjusting these accounts. To this allowance the appellant objects. This matter must be settled by the evidence. We do not deem $5 per day an extravagant charge for the services of a good, competent and accurate master and accountant. The books were accessible to the Judge of the Circuit Court. The question as to the actual employment of 100 days in this labor by the master was before him, and he found as a fact that such time was necessary to the examination of the books and the statement of the account. After careful consideration of the evidence upon the subject, we can see no ground to authorize a deduction in the charge. It is the duty of the judge to be careful that he does not allow for more labor than has been properly performed. Under this evidence we cannot say that the labor charged for was not performed. These costs, however, should be borne equally by the parties. Neither are blameless in this proceeding. Such is the rule in this State, (5 Fla., 503; 11 Fla., 234,) as well as in other States in cases of this character. 3 B. Mon. ; 2 Dev. Eq., 221; 1 Eng. Chy., 213–219.

The decree is reversed, and the case is remanded with directions to cause the master to restate the account between the parties in accordance with this opinion, and for such further proceedings as are conformable to law ; and it is ordered that the allowance to the master is affirmed, and that the costs in this court and in the circuit court be equally taxed against the parties to this controversy.