JOHN S. HARRIS, APPELLANT, VS. SARAH P. FERRIS, ET AL., APPELLEES.

1. A party entering into possession of property as lessee for a term of years under a contract to expend $1,000 in improving the property and to divide net profits with the lessor, is under obligation to keep an accurate account of his receipts and disbursements. These accounts the lessor has a right to examine. Where the lessee fails for years to render an account, keeps his accounts, such as they are, in an awkward and unintelligible manner, and makes expenditures unauthorized by his contract, his conduct is such as not to recommend him or his statements to favorable consideration.

2. Where the testimony upon which the master stated an account is lost, the appellant admitting that it was the principal testimony relied upon by both parties in the matter of expenditure, the action of the court sustaining the master must be presumed to be correct. In such a case, unless the appellant can show, in the absence of this testimony, "that no case could have existed, it being present," he cannot prevail.

3. A lessee thus in possession is not entitled to personal compensation for managing the property.

4. Where, upon a second reference, after exceptions to master's first report allowed, order of confirmation having been passed as to other matters, the master corrects a mistake in an allowance made in the first report, which was not made the subject of exception thereto, such second report being in this respect outside of the second order, is erroneous to that extent. The proper method to correct this error is not to except, but to apply to the court to refer the matter back for review. Where this method is not adopted and the matter is improperly made the subject of an exception, which the chancellor overrules, this court, upon appeal, will not reverse the decree if the matter of the exception was within the accounting directed by the original decree, and the presumption is that the action of the master and the court was just and proper.

Appeal from the Circuit Court for Duval county, to which court the case had been transferred from Clay county.

The facts of the case are stated in the opinion.

*Fleming & Daniel* for Appellant.

*J. C. Marcy & Son* for Appellees.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

Eliza Palmer and Halsted H. Hoeg, administrators of David L. Palmer, deceased, and Sarah P. Ferris, filed this bill against John S. Harris. Pending the suit, Eliza Palmer and Hoeg died, and James T. Wilson, administrator *de bonis non* of Palmer, continued it.

Plaintiffs allege that on the 13th of October, A. D. 1869, and during the life-time of Palmer, he and plaintiff, Ferris, " leased and let " the Sulphur Springs at Green Cove Spring, and the land upon which it is situated, in Clay county, for the term of ten years to Arthur F. Aldrich, the lease commencing December 1, 1869, with a privilege of renewal for ten years, Aldrich agreeing to expend for improvements on the spring and grounds one thousand dollars, and to pay Palmer and Ferris one-half of the net profits arising from the spring and grounds, the one thousand dollars not to be estimated as an expense.

The lease executed allowed Aldrich the privilege of laying a pipe from the boil of the spring to be used for conveying water to the hotel square so long as a hotel should be kept on the square. There were reservations of the privilege of use for the family of the plaintiffs and other parties, and other reservations in the lease which it is not material to mention.

That plaintiffs having great confidence in Aldrich, relied upon him to draw up the papers. Plaintiffs allege that in this lease there was a mistake concerning the pipe mentioned connecting the sulphur spring with the hotel lot across Saratoga street, it being the intention of the parties that the pipe should be used in the connection mentioned

only for the term of the lease, and not " so long as a hotel might be upon the lot."

Plaintiffs allege further that some time after the execution and delivery of this lease two other papers were presented to the said Palmer and Ferris in the presence of a judicial officer of the State of Florida, which were represented to be duplicate of the lease which they had already signed, and " that this duplicate or duplicates were for the purpose of simply getting another lease to have recorded, which representations were false ; that said papers were not duplicates, that instead of reciting a term of ten years plaintiffs afterward learned that it recited twenty, and that instead of being a lease to Aldrich exclusively, it was to him, his heirs, assigns, executors and administrators." A copy of this second lease is in the bill—annexed to it is a certificate of one of the witnesses " that the words ' his heirs, executors, administrators or assigns,' " and the words " No. (meaning number) one hundred and ninety-six" were interlined before the signing of the lease, and an acknowledgment of Palmer and Ferris that they executed the instrument for the purposes therein expressed. There is also an assignment of the lease by Aldrich to Harris, the defendant.

Plaintiffs allege delivery of possession under the first agreement, and that the alleged fraud was not discovered until after the death of David L. Palmer, who died April 17, 1871. They allege that defendant, Harris, was a party to this fraud ; that he went into possession under this fraudulent lease ; that he has refused to surrender it, and that he has appropriated the rents and profits of the property.

Plaintiffs pray for an account of the rents and profits of the property, that the error in the matter of the pipe contract be changed to conform to the real agreement, that the

second lease may be " delivered up " and " cancelled of record," and for general relief.

Defendant, Harris, answered that the first paper mentioned in the bill was considered by the parties as a mere agreement for a lease afterwards to be carefully drawn and executed ; that it was understood when this lease was executed that Aldrich had no money of his own to apply to these improvements, and that he relied upon the defendant to supply the necessary funds. He denies that there was any mistake made as to the pipe contract, affirms that everything was understood and was fair in the matter of the lease of the first of December, A. D. 1869, and expresses a willingness to account in accordance with the terms of his contract. He denies any right of plaintiffs to a surrender of the lease.

After testimony bearing upon the questions, the chancellor decreed that the second lease was the true contract between the parties, that their intention was that Aldrich should expend one thousand dollars in improvements upon the property, that it was afterwards to be kept in repair, and that necessary expenses in connection with the proper management and protection of the property should be paid.

The chancellor decreed further that the contract as to the pipe was as stated by the defendant.

The question as to which was the lease between the parties and the difference as to the contract concerning the pipe being settled by the court, and there being no appeal from such part of the decree as determined these questions, it is unnecessary to insert such testimony as is applicable to them. A part of the testimony brought out in this examination, which principally concerned the matter of the lease, consisted of the following " Spring account " which had been delivered to Hoeg, one of the administrators of the lessor Palmer :

"SPRING ACCOUNT."

| 1873. | | Receipts. | Expend's. |
|---|---|---|---|
| May | 1—By receipts from May to date...........$1,310.09 | | |
| | 1—To expenses from Jan. to date.......... | | $4,686.39 |
| | 31—By receipts for May, 1873......... ..... | 37.05 | |
| | 31—To keeper's board and wages for May........................$39.00 | | |
| | 31—To other expenses.............. 46.00— | | 85.00 |
| June | 30—By receipts for June, 1873.............. | 31.80 | |
| | 30—To keeper's board and wages for June........................$38.00 | | |
| | 30—To other expenses.............. 15.50— | | 53.50 |
| July | 31—By receipts for July, 1873.............. | 33.70 | |
| | 31—To keeper's board and wages for July........................$37.30 | | |
| | 31—To other expenses............. 4.00— | | 41.30 |
| Sept. | 30—By receipts for Aug. and Sept., 1873.... | 17.00 | |
| | 30—To keeper's board and wages for Aug. and Sept.............................. | | 58.01 |
| | 30—No other expenses..................... | | |
| Oct. | 31—By receipts for Oct., 1873.............. | 4.00 | |
| | 31—To keeper's wages for Oct., 1873.$4.00 | | |
| | 31—To other expenses.............. 1.00— | | 5.00 |
| Nov. | 30—By receipts for Nov., 1873.............. | 4.00 | |
| | 30—To keeper's wages.. ................... | | 4.00 |
| | 30—No other expenses..................... | | |
| Dec. | 31—By receipts for Dec., 1873.............. | 8.45 | |
| | 31—To keeper's wages............. $8.45 | | |
| | 31—To painting, white-washing, &c..44.35— | | 52.80 |
| 1874. | | | |
| Jan. | 20—By receipts from Jan. 1 to 20........... | 10.25 | |
| | 20—To wages of keeper.................... | | 10.25 |
| | 20—The receipts of the Spring from October 1 to Jan. 20, were allowed to Mrs. Sweat, a keeper, in compensation for her services during that time by agreement with Dr. Applegate. | | |
| | 31—By receipts from Jan. 25 to Feb. 1...... | 43.75 | |
| | 31—To keeper's board and wages...$13.67 | | |
| | 31—To other expenses.............. 4.20— | | 17.87 |
| Feb. | 28—By receipts for Feb..................... | 159.50 | |
| | Amount carried forward...................$1,659.59 | | $5,014.12 |

Harris v. Ferris et al.—Opinion of Court.

|  |  | Receipts. | Expend's. |
|---|---|---|---|
| Amount brought forward................... | | $1,659.59 | $5,014.12 |
| Feb. 28—To keeper's board and wages for Feb.... | | | 36.00 |
| 28—No other expenses..................... | | | |
| Mch. 31—By receipts for March, 1874........ .. | | 326.45 | |
| 31—To keeper's board and wages for March......................\$39.00 | | | |
| April 20—To other expenses............. 47.35— | | | 86.35 |
| 20—By receipts April 1 to 20............... | | 107.60 | |
| 20—To keeper's board and wages to 20..... ....................\$25.33 | | | |
| 20—To other expenses............. .... 40.52— | | | 65.85 |
|  | | $2,093.64 | $5,202.32 |
| Gents—Above footings show the total receipts and expenditures of the Spring from the start to April 20, 1874. The expenditures include the amount of $1,000, which was to be laid out by Messrs. H. & Co. Deducting the amount............................ | | 1,000.00 | |
| The Spring account stands debit April 20, 1874............................ | | 2,108.68 | |
|  | | $5,202.32 | $5,202.32 |
| A true copy.          (Signed) | | J. R. Adams. | |

This account, appearing in the testimony concerning the lease, the court in the decree establishing the lease ordered its reference to a special master for examination, with authority to take testimony as to its correctness under the construction given by the decree to the contract of lease.

The master reported that he had examined all of the witnesses produced before him, and had carefully examined the books and exhibits that were placed in evidence by the respective parties. He states that he has had to rely, to a great extent, upon the testimony of the witnesses, "as the books of the defendant have been kept in such an awkward and unskillful manner that they are made to deal in vague generalities, whence very little information can be gleaned;

that quite a number of charges are made under general terms, without any effort being made by way of explanation."

The master then states the gross receipts as derived from the testimony of the defendant. The defendant's testimony is, as stated by the master, that " embracing the last seven years the average gross receipts per year have been four hundred and seven odd dollars, leaving off the two first years of the seven before the main pools were built, the average for the remaining five years was six hundred and one dollars."

For ground rent of a store erected on the spring property he charges, for seven years, one hundred and forty dollars, making the aggregate gross earnings of the spring the sum of $3,115. As expenditures he allowed the sum of $1,799, thus: For taxes, $360; for hire of keeper of spring, $384; for board of keeper of spring, $720; for advertising spring, $50; for soap and towels, $75; for repairs, $210; total, $1,799.90, leaving net earnings $1,316, one-half of which sum is six hundred and fifty-eight dollars. From this sum he deducts what is called gross rent, $140; leaving $518.

He explains these credits thus: As to the taxes he states, " Mr. Applegate testifies that the spring property was assessed at ten thousand dollars, and that their entire property, inclusive of the spring property, was assessed at thirty-seven thousand dollars, but that the whole amount was subsequently reduced to eighteen thousand dollars." He continues: " On making the proper proportion I ascertain that this amounted to an assessment on the spring property of four thousand eight hundred and sixty-four dollars, inclusive of defendant's store house. *But on a further investigation I learn* that the spring property was assessed much lower at other times. I therefore consider that three thou-

sand dollars per year for six years (the tax for 1876 being unpaid) would be a fair and equitable assessment of their portion of the property." Then follows a statement of the testimony as to the rate of taxation, but as no objection is made to the rate as fixed by the master, it is unnecessary to insert it here.

As to the charge for the hire and board of keeper, he says: " The evidence shows that the keeper was charged divers amounts for board, and that while her salary was uniform in the amount paid, the employment for a stipulated sum in money was not mentioned; that at certain periods of the year she was allowed to receive the receipts of the spring in compensation for her labor. The periods of time would annually extend to four months, consequently, in making a charge four months must be deducted from the year and the charge made for eight months; and as the keeper was paid eight dollars per month, this would make her salary sixty-four dollars per year. Upon the testimony of Mr. Applegate the expense of caring for the spring until June, 1870, which to June, 1876, would constitute a period of six years, and at the rate of compensation heretofore mentioned, would aggregate for that length of time $384." As to the item for board, the master says: " In the matter of the board of the keeper, I cannot but regard the charges made by the defendant as extravagant. The defendant was running a hotel, and, for his own convenience, furnished the woman who cared for the spring with food from the hotel table, but it is not in evidence that she was furnished like a regular boarder and placed at the first table, and served in the same manner with the guests of the hotel. But it is in evidence that she eat at a table by herself; *and from the testimony* I conclude that in the matter of board she was regarded and treated as a menial, and not as a boarder. I must, therefore, disallow the charge

of thirty dollars per month, and settle upon an amount that would have secured a woman of her position in life, which was an humble one, good, comfortable board in a place like Green Cove Spring." He then allows ten dollars per month, making an aggregate of $720.

Of the charge for advertising, he says: " Taking as a basis the advantages " (we presume this to be a clerical error, and that it should be advertisements,) " placed in evidence, I conclude that fifty dollars would cover the *pro rata* share that should be charged to the spring account. In considering this charge we must recognize the fact that the advantagement " (we presume this word should be advertisments) " of the spring were entirely ancillary to the advertisement of the Clarendon Hotel, and by way of inducing patronage of the hotel." The master continues, " as to the charge for soap and towels furnished for the spring, the evidence shows that there was a kind of copartnership arrangement in the use of these articles between the hotel and the spring ; that they were purchased jointly and used jointly. The exact cost of these articles I cannot ascertain. Neither the evidence nor the books give the required information, and, consequently, I am driven to the field of estimate. I estimate the *pro rata* share of the spring to June, 1876, at seventy-five dollars."

As to the repairs, the master says: " In regard to the necessary repairs, I am compelled to solve the matter in the same manner that I solve the soap and towel question. In my opinion thirty dollars a year would cover the cost of repairs, making, for the seven years, two hundred and ten dollars." The master reports that he is convinced that in order to render the spring profitable, the defendant expended, in the outset, a larger sum than one thousand dollars upon the property, but considers that he has nothing to do with these sums under the order.

There were to this report ten exceptions. The first was because the master, in computing the receipts, did not take the exact figures shown by the testimony, but made an average estimate. The second was because the ground rent of the store was improperly included as a source of revenue to the spring. These two were sustained. The other eight exceptions were overruled, and the case was again referred to the master, with instructions " to reform his report to conform to the ruling of the court."

The master makes a second report under this order, in which he states that he has predicated all averages upon the actual figures given in evidence, and that his report is based upon their evidence. He deducted the ground rent. In this report he suggests that the charge for board of keeper is an error, and that it should have been for four months at ten dollars per month, and he in a new account stated allows the sum of $280 instead of $720, the sum allowed in the first account.

The defendant excepted to this supplemental report because it did not conform to the order to the master, because it did not conform to the order of the court directing exact figures to be taken as the basis of the estimate of receipts, and because of the reduction in the credit of seven hundred and twenty dollars.

These exceptions were overruled, and a decree passed for the sum due according to the report of the master.

The ground upon which a reversal of the decree is sought is the overruling these exceptions to the original and supplemental reports of the master.

All of the testimony taken under the reference of the account marked exhibit " C" before the master has been lost, and there is no testimony in the record but that used by the court in determining the questions raised as to the leases.

As the appellant contends that this testimony to some

extent sustains his exceptions, we insert so much of it as relates to the matter of the exceptions.

Mrs. S. P. Ferris states that she never received anything on account of the spring or any statement of its earnings, and that there was no agreement that the earnings should be applied to the further improvement of the spring, that she was never asked about it, and that it was agreed that $1,000 should be expended by Aldrich in improving it.

H. H. Hoeg, administrator of D. L. Palmer, states that he got at one time a statement of the earnings of the spring. The statement appears hereafter as exhibit C. In this there occurs, as will be seen by reference thereto, an item of a lumping charge of $4,686.39 for " expenditures." He states that he did not authorize an expenditure of the earnings of the spring upon its improvement; that he had one conversation with defendant, Harris, about the spring lease generally, in which he spoke of the earnings of the spring, and that he did not understand that any of the profits of the spring were to be used for the improvement of the spring over and above the $1,000 spoken of in the lease, except the expenses necessary to run the spring; that he protested against the earnings of the spring being used for the improvement of the spring, but that defendant said that he thought the lease authorized him to do exactly what he had been doing, and that he, Hoeg, objected to all of the items in the statement marked C, save those for running expenses, as his understanding from Mr. Palmer was that nothing but the current expenses should be deducted from the gross earnings.

The defendant, Harris, testifies that Aldrich, upon his return to New York, reported to him an arrangement which he thought of making with Mr. Palmer for the lease of Green Cove Springs and the property connected with it, provided he could get some one to join him who could furnish

the means to *fit it up* and put it in a *condition to be used*, and he solicited aid from him. It appears that in April, 1870, Mrs. Ferris visited the spring for some purpose.   Defendant says that it was for the purpose of talking to the people who were objecting to the improvements and threatening to tear down the enclosures.   There were also objections to cutting down the trees.   This witness states that upon this visit Mrs. Ferris expressed herself satisfied, and that he has ever since publicly and notoriously expended his money upon the improvements of the spring property, and asserted his personal control over the same, advertising the spring in the public prints, partially in his own name, without exception, until the commencement of this suit, and has been on the property personally some months every year.   His " action under the lease," he says, " has been to improve the spring, take care of it and provide for the public to bathe; that he cleared up the spring, fenced it in, cleared off the run-way dam to the river, spiled and planked in the spring, curbed and platformed it, excavated and sunk four timber bathing curbs for bathing pools, timbered and floored the bottom of them, constructed flumes for conducting water to each pool, built and sunk drains for pools to the river, built buildings for the keeper's office and for washing towels, constructed dressing-rooms in two continuous lines of one hundred and fifty feet, being seventy-five feet each, constructed flumes and water-ways for taking in and letting out the water, enclosed all of the bathing pools, enclosed all the bathing pools with a high fence, and the entire spring grounds were enclosed with a picket fence.   I expended several thousand dollars upon the spring, which I charged to the spring allowments.   I ran the spring afterwards.   The money arising from the spring was paid out for its care, expenses and improvements and the constant repair upon it.   There has not been a dollar expended but to pay the expenses and

render the spring productive; *productive of profits for the parties interested in the lease.* I did not expend the proceeds of the spring to make it profitable to the hotel without regard to Mrs. Ferris and Palmer. I've been running the spring four seasons. I don't know the time we commenced having debts, without my books. People bathe in both summer and winter. The summer bathing is very limited, scarcely enough to pay expenses. *The proceeds of the spring have been greater than the actual running expenses for towels, fuel and servant hire; that is, the current daily expenses. The excess was expended in many repairs and alterations to accommodate the business. I could not tell how much the proceeds exceeded the actual running expenses.* No money has ever been paid to the lessors.

" Mr. Palmer and Mrs. Ferris owned considerable amount of unimportant property in the way of lots and blocks at that end of the village. On the property bought by me from Mrs. Ferris and Mr. Palmer I have erected substantial buildings and a good hotel, known as the Clarendon Hotel, and have expended considerable money on a wharf at that end of the village. The steamers were induced to land at it. The village has grown. The visiting population has increased. The building of the hotel has added three-fourths more to the patronage of the spring. I have expended all of the receipts of the spring, and more too, upon the spring.

" I never would have built a hotel, a store, a wharf, in fact, would not have been there myself, but for the existence of the spring. The spring adds, to some extent, to the attraction and profit of my house."

William Long says: "When Mr. Harris and Aldrich took charge of the spring I helped work around it considerable. There were no improvements on the spring at this time save a few small bath houses built by private parties. There

were two paths leading to the spring, one from the northern side and one from the southern. The spring was almost in a wild state. It remained in this condition until Mr. Aldrich and Harris took possession. They improved it very much. The town has been greatly improved by the houses built around and the general improvement of the spring." He states that lots worth before these improvements $50 are now worth $200; one of such lots he bought from Mrs. Ferris; and that some costing one hundred dollars in 1868 and '9 had been sold for one thousand. In a great measure the improvements and development of the spring have been the leading cause for the advance in real estate and the growth and progress of the place.

What has been said embraces a full statement of the case as it appears from the record, except that the particular matter of the exceptions is not stated. This we will state when each exception is considered.

We enquire what is the precise nature of this case, and what are the relative obligations of these parties.

Palmer and Ferris execute a lease for twenty years of this spring. The lessee agrees to put one thousand dollars in improvements upon the property. To this venture one is to contribute a lease, the other a specific sum, to be expended in improvements, and they are to share net profits. The lessee here admits his liability to account, and the differences here arise out of this accounting. It is clear that it was contemplated by the contract that the lessee was to have the management and control, and this he states was his view of the contract.

The lessee enters into possession, and for years does not pretend to give any account. When he does it is unsustained by a single voucher, and contains different charges for the same service. Not only is this true, but instead of confining himself to the one thousand dollars to be ex-

7

pended upon the property, he submits an account, accompanied by no voucher, claiming in a lumped entry four thousand six hundred and eighty-six dollars and thirty-nine cents " as expenditures." This expenditure, he states, he thought he was authorized to make under the contract, in the face of its express terms fixing the expenditure to one thousand dollars, and after six or seven years' use of the property, paying no portion of its earnings to his lessors. This account brings the property in debt to him in the sum of two thousand one hundred and eight dollars and sixty-eight cents. The lessors disclaim giving any authority for this expenditure, the administrator of one of them (Hoeg) stating that he protested against it, and the lessee shows no authority. There must be some method of accounting for this state of things. The master seems to be of the opinion that the spring was "ancillary" in some matters to the hotel interest of defendant, and we think that he made it so to the full extent that he thought it would serve him.

Take the hotel interest away and no one would think for a moment of running the property in debt, or of incurring expenses amounting to $2,000 over and above the receipts.

The defendant here is in possession of property as its manager under an obligation to share the net profits of its use and employment. His liability to account, and his duty in the matter of its management, is analagous to that of a partner in possession managing partnership property, or a tenant in common in possession under a contract to share profits. The relation is that of a peculiar agency founded in privity of contract. In all such cases as this, where a party is in possession under contract to use and employ property, and to divide net profits, it is his duty to keep precise accounts of all his transactions, and to have them always ready for inspection and examination. Story's Eq. Jur., §466 ; Story on Part., §181 ; 16 Fla., 99.

Simple honesty and fair dealing require this, and while the lessor has no right to participate in the management, he does have the right to a fair and full exhibit of receipts and expenditures.

The master says of the books of the defendant here that they have been kept in an awkward and unskillful manner, and that very little information can be " gleaned " from them. The defendant himself says that he cannot tell " how much the proceeds exceeded the actual running expenses."

This general review of the nature of this case, and the management of this property by the defendant, result in disclosing nothing to recommend him to favorable consideration.

We are asked to reverse the decree in this case because the exceptions of the defendant to the master's reports, original and supplemental, were overruled. None of the testimony taken upon the second reference to state this account is before the court. Under his first exception defendant insists that the allowance for taxes upon the spring is too small. In this, as in other matters, he presents, so far as we can see, not even an allusion to a distinct voucher for their payment.

The master bases his allowance first upon the testimony of defendant's partner, Applegate. From the average and proportions given by him with reference to the taxation upon the hotel, the spring and other property, (he having failed apparently to keep any account of the spring in this matter separate from the hotel) the assessment, the master states, would be $4,864, including the store-house. But the master, upon "*further investigation*," learns that the spring property " was assessed much lower at other times," and fixes three thousand dollars as a fair and equitable sum. In the evidence in this record (and we have inserted all of

it that has reference to the questions arising upon these exceptions) there is not a syllable to show what this "further investigation" was, and none of the testimony taken upon the second reference, which was made for the special purpose of restating the account marked exhibit C, so far as it concerns this item, is to be found. It is alleged that it is lost. The necessary presumption here is that this testimony justified the conclusion of the master. This evidence not being transcribed in the record, we are, in the language of the Supreme Court of the United States, "bound to presume everything in favor of the correctness of the decision of the court below, until the contrary appears." Upon this principle, unless the appellant here can show, in the absence of this testimony, "that no case could have existed, it being present," he cannot prevail. 1 Peters, 21, 22; 5 Gray, 423; 102 Mass., 480; 107 ib., 64; 117 ib., 403. To set aside a master's report upon a question of fact, a plain case of error and mistake must appear. 1 Stock., 309, 659; 14 Vermont, 514; 5 Gray, 423; 7 Cush., 222; 10 Pick., 398; 36 Maine, 115; 5 Ind., 422; 13 Allen, 326; 11 Ga., 570; 3 C. E. Green, 141; 8 C. E. Green, 83.

The next exception is because the receipts from the spring for four months, which the keeper was allowed to retain, were not deducted from the gross receipts of the spring. The answer to this is that from the estimate of the gross receipts which the master made in the absence of a full statement by the defendant in charge, the wages and price for board, as allowed by the master, were deducted from the gross receipts. We can see no plain error here.

The next exception is to the allowance for board of the keeper of the spring. The evidence, so far as we have it, shows that she was paid about eight dollars a month wages, and it is stated by the master that she eat at a separate table from the regular boarders. With all the

testimony before the master, his conclusion was that ten dollars a month was the sum at which good comfortable board for one of the station of the spring-keeper could be obtained at Green Cove Springs. In the absence of the testimony, we cannot presume his finding wrong.

The further exceptions are on account of too small allowance for advertising, as well as for expense for soap and towels, and for repairs on the spring. We cannot, in the absence of the testimony, say that these charges are wrong. The appellant himself admits that the lost testimony was " the principal testimony relied upon by both parties in the matter of the expenditures of the spring." We certainly cannot, in its absence, presume that the act of the master and of the chancellor was contrary to it.

The next exception is because he was not allowed something for keeping the books. The record does not show that such allowance was ever requested. Occupying the relation he did, he assumed, under his contract, the responsibility of making some entry of his transactions and of managing the property without a salary. His relation was like that of a managing partner. If he paid out anything on this account it does not appear, and therefore whether in case of such an expenditure it would have been a proper charge is not involved.

The first exception to the original report was because the master did not take the exact figures furnished in the testimony in estimating the receipts. This exception was allowed and the report was referred back for correction. The master then reported, stating that he predicated his average and estimates " upon the actual figures given in evidence." To this there is an exception on the ground that the master did not in this respect conform to the order of court. The court approved this last report, and in the

absence of the testimony we must presume the action of the court correct.

The master in this supplemental report, without any specific direction to that effect by the court, suggested that the charge of board for keeper for the entire year, as he had allowed, was a "clerical error," and should have been made for four months, at the rate of ten dollars per month. This charge the court allowed and decreed accordingly. This action is the subject of an exception, the ground being that it was "without authority." So far as the rate and the time allowed is concerned, there is no testimony here to show it is wrong ; and we repeat what has been already said in reference to this subject. The only objection is that the charge was not authorized by the order of re-reference, the plaintiff having failed to perceive the error or to make any exception to the charge as originally made by the master.

The general rule is that a master in making a report must conform to the directions of the decree, and if he reports as to matters not referred to him, so far as it relates to that matter it is a nullity. 5 Fla., 478. While this is true, it is also true that the proper method to correct such an error is not to except, but "to apply to the court that it may be referred back to the master to review his report," thus giving the court the opportunity to do complete justice ; and, if no such application is made, and the report should be confirmed, the court will pay no attention to it, except so far as it is warranted by the decree. Daniell Chy. Pldg. and Practice, §1296 ; 6 Simons, 605 ; 6 Paige, 127 ; 27 Vermont, 695 ; 9 C. E. Green, 25. This follows from the general rule that all proceedings subsequent to the decree must be consistent with it. If justice requires an alteration of the decree it must be reheard. The master

cannot correct the error by going beyond the decree in his report.

Here no such application was made to correct the report, and while it is beyond the matter involved in the second reference, it is clearly within the accounting directed by the decree, upon which all of the accounting is based. The defendant, having failed to make the proper application, and the matter being entirely within the scope of the original decree to account, and the action of the master having met the approbation of the chancellor, we think, upon an appeal, this should not be a ground of reversal. The defendant having failed to adopt the proper method for correction, if there was error or mistake, in the absence of any merit, so far as we can see in the objection, we think the decree should be affirmed.

The dercee is affirmed.